## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

OLATHE-SANTA FE PARTNERSHIP,                    )
Managing Partner Village Properties, Inc.,      )
100 E. Park Street, Suite 206,                  )
Olathe, Kansas 66061,                           )
                                                )
and                                             )
                                                )
VILLAGE PROPERTIES, INC.,                       )     Civil Action No.  12-cv-2374 CM/KMH
100 E. Park Street, Suite 206,                  )
Olathe, Kansas 66061,                           )
                                                )
and                                             )
                                                )
TONY R. PLUNKETT,                               )
14125 W. 143rd Street,                          )
Olathe, Kansas 66062,                           )
                                                )
and                                             )
                                                )
CHARLES A. WHITE,                               )
612 Penrose Lane,                               )
Olathe, Kansas 66062,                           )
                                                )
and                                             )
                                                )
JAMES J. GREEN,                                 )
21150 W. 159th Street,                          )
Olathe, Kansas 66061,                           )
                                                )
and                                             )
                                                )
PYRAMID REALTY ASSOCIATION,                     )
501 E. Grace Terrace,                           )
Olathe, Kansas 66061,                           )
                                                )
and                                             )
                                                )

JEFF WYLER, INC.,                            )
100 E. Park Street, Ste. 206,                )
Olathe, Kansas 66061,                        )
                                             )
                           Plaintiffs,       )
v.                                           )
                                             )
JOHN K. DOULL,                               )
9120 West 135th Street,                      )
Overland Park, Kansas 66221,                 )
         Serve: John K. Doull,               )
                9120 W. 135th Street,        )
                Overland Park, Kansas 66221, )
                                             )
and                                          )
                                             )
NANCY A. TAYLOR,                             )
9120 West 135th Street,                      )
Overland Park, Kansas 66221,                 )
         Serve: Nancy Taylor,                )
                9120 W. 135th Street,        )
                Overland Park, Kansas 66221, )
                                             )
and                                          )
                                             )
JOHN V. DOULL,                               )
9120 West 135th Street,                      )
Overland Park, Kansas 66221,                 )
         Serve: John V. Doull,               )
                9120 W. 135th Street,        )
                Overland Park, Kansas 66221, )
                                             )
and                                          )
                                             )
THOMAS DEBACCO,                              )
9120 West 135th Street,                      )
Overland Park, Kansas 66221,                 )
         Serve: Tom DeBacco,                 )
                9120 W. 135th Street,        )
                Overland Park, Kansas 66221, )
                                             )
and                                          )
                                             )

KENT WHITTAKER,                               )
9120 West 135th Street,                       )
Overland Park, Kansas 66221,                  )
     Serve: Kent Whitaker,                  )
         9120 W. 135th Street,          )
         Overland Park, Kansas 66221,   )
                                        )
and                                           )
                                          )
BRAD HARVEY,                                  )
9120 West 135th Street,                       )
Overland Park, Kansas 66221,                  )
     Serve: Brad Harvey,                    )
         9120 W. 135th Street,          )
         Overland Park, Kansas 66221,   )
                                        )
and                                           )
                                          )
MICHAEL N. MCDANIEL,                          )
9120 West 135th Street,                       )
Overland Park, Kansas 66221,                  )
     Serve: Mike McDaniel,                  )
         9120 W. 135th Street,          )
         Overland Park, Kansas 66221,   )
                                        )
and                                           )
                                          )
CORNERSTONE BANK,                             )
9120 West 135th Street,                       )
Overland Park, Kansas 66221,                  )
     Serve: John K. Doull or,               )
         Person in Charge of Office,    )
         9120 W. 135th Street,          )
         Overland Park, Kansas 66221,   )
                                        )
         Defendants.                    )

## COMPLAINT

Plaintiffs Olathe/Santa Fe Partnership ("OSFP"), Village Properties, Inc.
("Village"), Tony R. Plunkett ("Plunkett"), Charles A. White ("White"), James J. Green

("Green"), Pyramid Realty Association ("Pyramid") and Jeff Wyler, Inc. ("Wyler") ("Plaintiffs" or "OSFP Parties"), for their Complaint against John K. Doull ("John K. Doull"), Nancy Taylor, ("Taylor"), John V. Doull, ("John V. Doull"), Kent Whittaker ("Whittaker"), Michael N. McDaniel ("McDaniel"), Thomas DeBacco ("DeBacco"), and Cornerstone Bank ("Cornerstone" or "Bank"), state:

1.   OSFP is a Kansas partnership doing business in Kansas.

2.   Village Properties, Inc. is a Kansas corporation doing business in Kansas.

3.   Plunkett, White, and Green are Kansas residents.

4.   Pyramid is a Kansas corporation.

5.   Wyler is a Kansas corporation.

6.   Cornerstone Bank ("Cornerstone" and/or "Bank" is a banking organization doing business in Kansas.

7.   John K. Doull, John V. Doull, Brad Harvey, and Nancy Taylor are officers of Cornerstone.

8.   Kent Whittaker, Michael N. McDaniel, and Thomas DeBacco are outside directors of the Bank (collectively Kent Whittaker, Michael N. McDaniel, and Tom DeBacco are sometimes referred to as the "Outside Directors").

9.   This Court possesses jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as this matter arises out of federal law under 18 U.S.C. § 1962.   This Court also possesses jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367.

10.     Defendants are subject to this jurisdiction of this Court by transacting business in the state of Kansas and because the transactions and events giving rise to the claims in this action occurred in the state of Kansas.

11.     Venue is proper in this Court because a substantial part of the transactions and/or events giving rise to the claims in this action occurred in this judicial district.

***Background and solicitation of business from OSFP by the Bank.***

12.     Larry Huckleberry and Elizabeth Leek started doing business with John K. Doull in 1992 when he worked at the Bank of Blue Valley ("BBV").  From February 1992 through 2000, while John K. Doull was at BBV, various entities in which Mr. Huckleberry, his trust, or one of his entities was the managing partner or member (collectively "Huckleberry Entities") obtained 15 loans from BBV varying in amounts from $120,000 to $1,600,000.

13.     In early 2001, John K. Doull left Bank of Blue Valley to establish Cornerstone, which was formed on or about October 26, 2001.

14.     John K. Doull courted Mr. Huckleberry and Ms. Leek to establish a banking relationship with Cornerstone and to move their accounts and loans to Cornerstone.

15.     On February 11, 2002, two BBV loans were refinanced with Cornerstone. From 2002 through 2008, various Huckleberry Entities obtained 11 loans from Cornerstone.

16.     By 2005, the Bank had become the primary lender for the Huckleberry Entities.

*The 2006 refinance of existing debt and purchase of Lot 29 by OSFP.*

17.     Ms. Leek submitted a loan package which included the application, 3 years of financial statements, 3 years of tax returns, maps identifying OFSP's property and the proposed collateral, the contract for Lot 29 as well as surveys, etc.

18.     At the October 4, 2006 meeting, Ms. Leek explained to John K. Doull what OSFP hoped to accomplish:  1) consolidate the two Cornerstone land loans and the BBV land loan, 2) purchase Lot 29, 3) pay loan costs, and 4) have enough cash in the bank to pay the taxes and specials on all the property and all the debt carry for 4 years.

19.     At the October 4, 2006 meeting, Ms. Leek went over the numbers on the application summary with John K. Doull and explained that, based on her calculations, OSFP needed an interest-only loan of $8,788,000 to meet its objectives.

20.     Ms. Leek explained at the October 4, 2006 meeting that OSFP would need $2,086,479 to purchase Lot 29 and $3,530,598 to consolidate the existing land loans into one loan.

21.     Ms. Leek stated to John K. Doull that OSFP would secure the debt with the recently acquired lots (10-14), the lot being purchased (29), and lots 27 and 28.

22.     Sometime after October 4, 2006, but before October 25, 2006, John K. Doull called Ms. Leek and advised her that the loan had been approved as submitted except that the Bank wanted a 7.5% rate and that the loan would be capped at 75% of the appraised value of the lots being proposed as collateral.

**On November 6, 2006, despite previously advising OSFP that the loan had been approved, Cornerstone determined that it could not loan the money to OSFP because it would violate its legal lending limit.**

23. In early November 2006 after the "approv[al] [of] the loan", the Bank realized that it had a "problem fitting the loan within the bank's legal lending limit."

24. The Bank and John K. Doull knew that it "didn't have capacity from day one to make this loan without participation assistance."

25. The Bank and John K. Doull did not "communicate that to Ms. Leek from day one [specifically] that [the Bank] couldn't make the loan without participation assistance" because John K. Doull believed the Bank was "not required to."

**The change by the Bank from interest only loan to an amortizing loan roughly 24 hours before Closing.**

26. On or about November 14, 2006, the Bank presented OSFP with loan documents which contained the terms agreed upon between the parties.  Under the agreed upon terms, OSFP's annual debt service for *interest only* would total approximately $646,875.00 and would result in the monies being borrowed being depleted in approximately four (4) years or by November, 2010.

27. Later that same day, John K. Doull contacted Ms. Leek sometime between 9:11 a.m. and 12:26 p.m. and requested that Ms. Leek meet with him.

28. At this meeting, John K. Doull informed Ms. Leek that the Bank wanted to change the payment terms from interest-only payments to principal and interest payments based on a 30-year amortization.

7

29.     The Bank was requesting revisions to the loan documents, specifically to change the repayment terms from interest only payments to amortize the loan over thirty (30) years and to provide for monthly principal and interest payments that would result in an annual debt service of $723,687.00 and would result in the monies being borrowed being depleted in approximately three and a half (3 ½) years or by May 2010.

30.     John K. Doull further informed Ms. Leek on November 14, 2006 that the Bank did not want to participate out the loan but needed the loan to be an amortizing loan so that the Bank could finance the entire transaction based upon certain regulatory requirements involving the Bank's lending limits.

31.     John K. Doull advised Ms. Leek that making the loan an amortizing loan would put the Bank within its lending limit and that the Bank would not have to participate out any part of the loan.

32.     Shortly after Ms. Leek's meeting with Mr. Doull, Ms. Leek received a fax from Beth Erwin from the Bank providing that "Here is the new promissory note changing the repayment terms to principal and interest being amortized over a 30-year period."

33.     Ms. Leek put an asterisk by the end of the sentence and wrote down the explanation that she was given by John K. Doull: "*Requested by John. (doesn't have to participate that way because he can use 30% vs. 25% in his calc)" I put the noted cover sheet in the loan file.

34.     John K. Doull utilized his strong relationship to his advantage knowing that Ms. Leek and Mr. Huckleberry trusted him and placed confidence in John K.

Doull's statements that their accommodation would allow John K. Doull to retain the entire loan without involving participating banks with which OSFP had no relationship.

35.     Ms. Leek told John K. Doull at the November 14, 2006 meeting that she was concerned about changing the loan to an amortizing loan and reminded John K. Doull that OSFP's loan application had been for $163,000 more than what the Bank had approved and that, consistent with the loan application, even with interest-only payments and an $8,788,000 loan, OSFP only had enough cash to service the loan and carry the property for four years (without a sale).

36.     John K. Doull advised Ms Leek that if OSFP agreed to make the loan amortizing, that the Bank under its agreements with OSFP would advance the loan back up after OSFP paid the principal balance down if OSFP agreed to make principal and interest payments instead of interest only.

37.     In reliance on the agreement of the Bank to advance the loan back up as needed by OSFP, OSFP agreed to change the loan to an amortizing loan.

38.     OSFP would not have agreed to the Bank's request to change the Loan to an amortizing loan if OSFP had known that the Bank would not honor its agreement to advance the loan back up.

39.     The Bank advanced the full amount of the Note at the closing of the loan transaction on November 16, 2006.

40.     On or about November 15, 2006, OSFP executed a certain Promissory Note (Commercial – Draw) with Cornerstone Bank ("Note" or "Loan").

41.     The Note, on its face, does not indicate that it is single-advance note.

42.     The Note provided for multiple "ADVANCES".

43.     The Note provides in part that "Advances under this Note are made according to the following terms and conditions."

44.     The Note further provides in part that:

"I or anyone I authorize to act on my behalf may request advances by the following methods.

(1) I make a request in person.

(2) I make a request by phone.

(3) I make a request by mail."

45.     The Note also provides that "[o]n my fulfillment of this Note's terms and conditions, you will disburse the advance in any manner as you and I agree."

46.     The Note provides that Cornerstone Bank may "grant . . . a request [for an advance in excess of the credit limit]."

47.     The Note provides:  "Obligatory Advances.  [Cornerstone Bank] will make all Loan advances subject to this Agreement's terms and conditions."

48.     The Note provides:   "Credit Limit.   I understand that you will not ordinarily grant a request for an advance that would cause the unpaid principal of my Loan to be greater than the Principal limit."

49.     The Note provides that " . . . amounts advanced from time to time under the terms of this Note up to the maximum total principal balance of $8,625,000.00 (Principal) . . ."

10

50.    The Note provides that "[t]he actual amount of my final payment will depend on my payment history."

***The prior loan documents between OSFP and Cornerstone explicitly limited advances when the loan was a "single advance" note.***

51.    The Bank had been involved in many other "loan transactions with OSFP other than the $8.625 million Loan" where John K. Doull signed the loan documents for the Bank.

52.    John K. Doull had "a general understanding that the other notes that [the Bank] asked [OSFP] to sign specifically used the words "single advance".

53.    John K. Doull also understood "that when [the loan document] described a single advance note, that the loan documents that you would ask [OSFP] to sign in the past clearly said no additional advances are contemplated under this note … when it was describing a single advance note."

54.    Yet, the Note the Bank asked OSFP to sign on November 15, 2006 did not contain any such language stating that it was a "single advance" Note.

55.    John K. Doull and Brad Harvey admitted that there was no language in the Note that prohibited the funds from being advanced after principal pay downs were made by OSFP.

*The written terms of the Note had no language stating that the principal amount could only be advanced "one time"; yet this was precisely how clearly the loan papers signed in that past by OSFP had made the point when the parties only intended to advance the principal "one-time".*

56.    John K. Doull knew that "the very loan papers that [the Bank] had asked [OSFP] to sign in the past said that you could only draw the principal one time, [and specifically] used the words "one time".

57.    Moreover, John K. Doull knew that "if [the Bank] wanted to [it] could have asked Beth Erwin to type in [the loan documents] that this was a loan where the principal could only be advanced "one time."

58.    Knowing all this, neither John K. Doull nor anyone else from the Bank sought to clarify the Note in any way to make it clear to OSFP that the principal on the Note could only be "advanced" "one time".

59.    At the time the Bank made these promises and representations, the Bank knew that OSFP was due to close on the real estate transaction the next day, and that if OSFP did not close on the real estate transaction OSFP would forfeit a $50,000.00 earnest money deposit.

60.    OSFP was relying on its lengthy good banking relationship with and promises made by the Bank when it agreed to the change.

61.    In reliance on John K. Doull's promises to Ms. Leek on November 14, 2006, OSFP and the partners agreed to the revised terms.

62.    Had OSFP and the partners known that the Bank would not fulfill the agreement made with OSFP, OSFP and the partners would not have entered into the

revised agreement.

*In direct contrast to what John K. Doull told OSFP, when OSFP transaction closed in November, 2006, neither Cornerstone nor John K. Doull had any intent to allow OSFP to advance the money once OSFP had made a principal pay down.*

63.     According to John K. Doull, it was his intent and the Bank's "intent that when this transaction was finalized and closed that whatever principal payments that Olathe/Santa Fe had made could not be readvanced on that loan under the documents that [the Bank was] preparing and Doull intended that "Olathe/Santa Fe had no rights to readvance that money once they had made a principal reduction on the loan…."

64.     When John K. Doull "signed the loan papers" including the "note, and the other related documents", John K. Doull "believe[d] that Olathe/Santa Fe had no rights to come back to the bank and say, we want to readvance the principal reductions that we've made over the course of this loan."

65.     That was John K. Doull's intent "when [he] signed the documents."

*John K. Doull is unable to read the Note and tell anyone what provisions of the documents state that funds cannot be advanced after the principal is paid down.*

66.     John K. Doull initially took the position in his deposition that "Ms. Brehm, Mr. Huckleberry, and Ms. Leek were all using the term "readvance" [incorrectly] because in [Doull's] view [the] loan didn't allow that to happen" because in Doull's opinion that "language - [readvance] - cannot be contractually fulfilled".

67.     John K. Doull's position was based on his claim that he had "read the document and [Doull] believe[d] the document clearly shows there's no right to readvance on that loan."

13

68.    Yet, when John K. Doull was pressed concerning "[w]hat language in that document [he] reviewed that led … to the conclusion that it was so clear that there was no right to readvance money that had been paid down on that loan", John K. Doull responded:

> "I'm not sure I could say -- I could point to a language that said it was so clear that it can't do that.  I mean, I'm not going to say I've got an opinion that this specifically says it. I'm just saying we relied on that document and the sophistication of our borrowers to understand the document to their best knowledge and what was communicated.  So I'm not sure I can give you an opinion."

***In direct contrast to what John K. Doull told OSFP, when the OSFP transaction closed in November, 2006, John K. Doull signed two separate agreements with two "participating" banks and was actively seeking a third.***

69.    In direct contrast to what John K. Doull told Ms. Leek on November 14, 2006, the Bank signed two participation agreements the following day to participate in the $8.625 million transaction with OSFP.

***Prior loan documents between OSFP and Cornerstone showed that the Bank used loan documents that explicitly limited advances to "one single advance" when the loan was a "single advance" note:***

66.    The Bank had been involved in many other "loan transactions with Olathe/Santa Fe other than the $8.625 million Loan" where John K. Doull signed the loan documents for the Bank.

67.    John K. Doull had "a general understanding that the other notes that [the Bank] asked [OSFP] to sign specifically used the words "single advance".

68.     John K. Doull also understood "that when [the loan document] described a single advance note, that the loan documents that you would ask [OSFP] to sign in the past clearly said no additional advances are contemplated under this note … when it was describing a single advance note."

69.     Yet, the Note the Bank asked OSFP to sign on November 15, 2006 did not contain any such language stating that it was a "single advance" Note.

70.     John K. Doull and other loan officers all admitted that there was no language in the Note that prohibited the funds from being advanced after principal pay downs were made by OSFP.

***Officers of the Bank testified that if the Bank intended for principal to be advanced "only one time" that the documents would clearly say "one time only"; Loan #906003 fails to say "one time only":***

71.     A "multiple advance loan" involved making "more than one advance of principal" and a "single advance loan" only involved one single advance of principal.

72.     Moreover, a "closed end loan" involving a "single advance" meant the entire principal was advanced one time at closing.

73.     According to the Bank, a "closed end line of credit" means you can borrow "the amount of the note one time."

74.     On an "open end line of credit" a borrower may "borrow up to the maximum amount of principal more than one time."

75.     According to Brad Harvey, his "understanding after 30 years in the banking business" is that "if a loan document said this is a closed end line of credit

and went on to say, 'You and I agree that I may borrow up to the maximum only one time', you would reach the conclusion that that was a closed end line of credit."

76.     On an "open end line of credit" when a borrower pays "down part of the principal balance on a loan" the borrower then has the right to "readvance and borrow that principal more than one time."

77.     According to Mr. Harvey, if the loan documents the Bank asked its customers to sign does not "specifically say it's an open end line of credit or a closed end line of credit, but says that it's a multiple advance loan" there is nothing to put the customer on notice regarding whether the loan is a "closed end line of credit" or an "open end line of credit" – the Bank simply "assumes" that it is "closed end" line of credit.

78.     The Note with OSFP did not provide one way or the other that it was a "closed end line of credit" or an "open end line of credit".

79.     Paragraph 3 of the Note did not provide any "specific language that says [the loan] can only be advanced up once."

80.     Nowhere in the Note with OSFP did the Bank make "it clear that [OSFP] had no right to readvance the money once they paid down the principal on the loan."

81.     According to Mr. Harvey, based upon his 30 years of banking experience, if the Bank officer was "discussing and told the customer that they were going to have the right to readvance principal" after the customer "had paid down the loan" that the Bank would not use the form of the Note used with OSFP, but instead would use a form

16

which made it more clear that the customer had the right to readvance the loan more "than one time".

82.    According to Mr. Harvey, the form of the note to be used when the Bank officer was "discussing and told the customer that they were going to have the right to readvance principal" after the customer "had paid down the loan" should explicitly say that the customer "may borrow up to the maximum amount of principal more than one time".

83.    Mr. Harvey has known John K. Doull for over 20 years and knows that John K. Doull had 25 years of banking experience in 2006 when these transactions were discussed with OSFP, and Mr. Harvey "had no doubt" that Mr. Doull understood "what the loan documents meant that he was actually preparing and approving on behalf of the bank."

*The Bank's sworn testimony and emails show that from June 15, 2010 to early July, 2010 that the only reason the Bank provided to OSFP not to advance again the principal already paid down by OSFP on Loan #906003 was because "circumstances had changed"; during this time period, the Bank never told OSFP that Loan #906003 did not provide for the funds to be advanced on a revolving basis:*

84.    OSFP paid down the principal balance on the Note by $308,661.22.

85.    On or about June 15, 2010, OSFP, consistent with the Note, requested that the Bank advance the loan for the June 15, 2010 payment, but the Bank failed to do so.

86.    Mr. Huckleberry and Ms. Leek made this request in person to John K. Doull and John V. Doull, John K. Doull's son, on June 15, 2010 at a meeting at the Bank.

87.   On June 15, 2010, Ms. Leek and Mr. Huckleberry came to the Bank and "wanted to, first of all, readvance on the land loan for the payment that was due that day, the principal pay downs that they had made, that was the first request."

88.   Thereafter, on June 24, 2010, John V. Doull emailed Ms. Leek and stated that "[t]imes have drastically changed from when the loan originated.  At this time the Banks [sic] initial thoughts are not to re-advance . . ."

89.   The Bank knew that the very written agreements between the Bank and OSFP deleted all "insecurity" provisions.

90.   The written agreement John K. Doull signed and initialed as President of the Bank explicitly removed any right the Bank may claim that it had to not "advance" funds under the Note because the Bank thought "circumstances had changed."

91.   The Bank asserted these changed circumstances as its only excuse for not advancing the funds.

92.   OSFP and the partners relied in good faith on the representations and promises made by John K. Doull as president of the Bank.

93.   After failing to fund the Note as agreed, the Bank notified Plaintiffs that the Loan had been accelerated and the full amount was then due and owing.

94.   At the June 15, 2010 meeting with John K. Doull and John V. Doull, Mr. Huckleberry very emphatically stated "I want you to do what you told us you were going to do and readvance that principal that we paid down because we need it now", and although John K. Doull does not recall whether Mr. Huckleberry "used the word 'readvance' or not" he recalls that this was "the essence … of what … they asked for."

18

95.     John K. Doull acknowledges that Ms. Leek and Mr. Huckleberry claimed that Doull had made "representations to Ms. Leek that it was their understanding that when they agreed to make this additional $7,000 per month principal payment, that if they needed to readvance that principal at a later date, they would have the right to do so."

96.     John K. Doull clearly understood that "when they came to your office on June 15th, 2010" Mr. Huckleberry and Ms. Leek "want[ed] to make the interest payment that [was] due [that day] by readvancing the money that [had been] paid down on the principal … because that's what [the] agreement was."

97.     At a subsequent meeting on July 22, 2010, Ms. Leek inquired of John K. Doull regarding the agreement to advance the Note back up, and John K. Doull responded that the agreement to advance the Note back up was "more like an option."

***The Bank's testimony that its true intent in refusing to "readvance" any funds under Loan #906003 was to "renegotiate" the collateral for the loan even though it had agreed to specifically waive any right to claim it was "insecure" because of insufficient collateral values:***

98.     "[I]n the summer of 2010" the Bank "want[ed] OSFP to negotiate with the [Bank]" on giving the Bank more collateral in return for the Bank agreeing to advance money under the Note, but Mr. Huckleberry "was adamant about what he wanted to do" – he wanted the Bank to do what it said it would do by readvancing the principal pay downs as agreed.

99.     "[I]n the summer of 2010 [the Doulls] on behalf of the bank were asking Olathe/Santa Fe to give [the Bank] the 82 acres that they owned free and clear as

19

additional collateral" because the Bank wanted "additional collateral for additional funds…."

100. Moreover, the Bank was requesting additional financial information from OSFP and Mr. Huckleberry to see if "there [were] other assets or personal assets or capital that could be injected as a part of a plan to work through these additional funding needs."

101. The Bank's plan was that if OSFP "gave [the Bank] some additional collateral" the Bank was going to "loan some more money."

102. The Bank could then use the additional funds that were loaned to OSFP "to pay [the Bank more] interest" that was accruing.

103. After the Bank "went to [OSFP] and … said, if you give us more collateral, we'll consider giving you more money to pay us the interest, [OSFP] said to [the Bank], no, we want you to readvance the money like we think you agreed to do."

104. OSFP made it clear that they "want[ed] [the Bank] to readvance the money on what [OSFP had] paid down based upon what collateral [they had] already given [the Bank]."

***The appraisal the Bank used to "renegotiate" with and to apply leverage to Plaintiffs demanding more collateral was not accurate and the Bank knew it.***

105. As set out in the Bank's own internal files, the Bank did not believe the appraisal they received from Integra Appraisals was remotely accurate when it concluded the property was only worth $4.7 million.

106.    The Bank used this information which the Bank believed to be inaccurate as a basis upon which to claim the Bank needed more collateral.

107.    John K. Doull made representations to OSFP in November, 2006 that the parties were entering into an agreement whereby the principal payments made by OSFP on Loan #906003 could be advanced again after principal payments were made by OSFP.

108.    During the meeting on November 14, 2006, John K. Doull induced Plaintiffs through Liz Leek to modify the loan transaction as requested by John K. Doull because of representations made by John K. Doull to Ms. Leek.

109.    Plaintiffs never would have entered into the transaction but for the representations made by John K. Doull to Ms. Leek on or around November 14, 2006.

110.    Prior to entering into the November, 2006 transaction on Loan #906003, John K. Doull was well aware of prior loan transactions between the parties and the specific language used in those prior loan transactions.

111.    John K. Doull was well aware that when the Bank intended for a loan to be a "single-advance" loan, that the Bank would choose form documents that clearly stated the loan was a "single-advance" loan.

112.    John K. Doull specifically chose a loan document that did not include any language that said "single-advance" loan even though John K. Doull understood that all funds were going to be advanced at Closing.

113.    The closing statements, the single mortgage prepared by the Bank for all of the properties to close at one time as part of one closing, the letters provided by OSFP

21

Parties to the title company, and communications between John K. Doull concerning amounts to be deposited in Cornerstone Bank by OSFP Parties once all of the money was funded at one closing, show that John K. Doull and the Bank understood that all funds were going to be disbursed at "one single" closing.

114.   For John K. Doull to use a loan document that included "multiple advances" language shows that he understood that Ms. Leek and OSFP Parties were relying on the statements that he made that the transaction that they were entering into was one whereby principal pay downs by OSFP could be advanced again after they had been made.

115.   Moreover, Brad Harvey and John K. Doull and other officers of the Bank understood that if the Bank intended for the principal amount on Loan #906003 to be advanced only "one time" that the Bank would have set that out in the loan papers it requested OSFP Parties to sign.

116.   John K. Doull was aware by virtue of the fact that he signed loan documents with OSFP Parties and the fact that they were one of his largest customers that in the past when the Bank intended for the principal to be advanced only "one time" the Bank specifically used a loan document that used the phrase "one time".

117.   The Bank did not select or use a document that included the phrase "one time" under Loan Number 906003.

118.   John K. Doull and the Bank understood that the loan documents they selected and asked OSFP Parties to sign were documents that did not make it clear that the principal could only be advanced "one time" or "more than one time".

119.    John K. Doull admitted that he could have easily had Beth Erwin, the loan processor at the Bank, or John K. Doull, himself, type in the words "one time" if, in fact, that is what the Bank's intent was.

120.    Even though the Bank and John K. Doull typed in numerous changes to the loan documents, the Bank, through John K. Doull, and his assistant, Beth Erwin, never modified any of the "multiple advance" language in the Note to indicate that it was "one time" only.

121.    According to the Bank's own officers including Mr. Harvey, if the Bank wanted to make it clear to its customer that the loan was only a "single-advance" loan and that the principal could only be advanced "one time", the Bank would have put that language in the loan documents.

122.    No such language is contained anywhere in Loan #906003.

123.    John K. Doull, who has been involved in the banking industry for over twenty-five (25) years, and Brad Harvey, who has been in the banking industry for over thirty (30) years, both understood that if the Bank chose to make this a "single-advance" loan and that the principal could only be advanced "one time" that the Bank understood how to do this and it chose not to do so under the circumstances surrounding Loan #906003.

124.    If the loan officer was discussing with the customer that the principal could be advanced after it had been paid down, and the loan officer intended not for the principal to be advanced "more than one time" that the loan officer very clearly would have inserted that into the loan document.

23

125.    The reason John K. Doull was unable to identify any language in any of the loan documents that prohibited the principal from being advanced "more than one time" is because the language does not exist in the loan papers that the Bank requested the OSFP Parties to sign.

126.    John K. Doull understood what the loan documents meant, clearly made changes to the loan documents, and yet, when requested in his deposition to identify language in the loan documents that prohibited the "multiple advance" of principal "more than one time" John K. Doull could not point to any language in the loan document that prohibited that.

127.    When the OSFP Parties including Mr. Huckleberry demanded that the Bank advance monies under Loan #906003, the Bank did not reject that request out of hand and point to language in the loan documents that prohibited such an advance.

128.    Instead, the Bank responded on June 24, 2010 – nine days later with plenty of time to review the documents surrounding Loan #906003 - to Mr. Huckleberry's request that, in fact, "circumstances had changed" and that the Bank was then inclined not to advance the money.

129.    If the Bank believed in June 15, 2010 or June 24, 2010 that it had no obligation to advance the money, it would have said so.  Instead, the Bank made an excuse that "circumstances had changed."

130.    The Bank was attempting to renegotiate with its customer the collateral that would secure the Loan.  The Bank's actions in doing so were in bad faith, and dishonest.

131.    The Bank used an appraisal that the Bank knew was inaccurate.

132.    Mr. Harvey wrote a memorandum to bank officers specifically identifying how he did not believe the appraisal being used by the Bank to renegotiate its collateral with its customer was valid.

133.    The Bank was under pressure, admitted to by the bank officers, concerning its real estate loan portfolio and the excessive concentration the Bank had in real estate.

134.    The Bank was attempting to renegotiate a loan transaction for more collateral when the Bank had initially signed documents with its customer that said it could not request additional collateral or claim that it was insecure".

***In December, 2007, the Bank approached OSFP regarding restructuring loans.***

135.   On December 10, 2007, John K. Doull sent Ms. Leek an email asking if he could meet with Ms. Leek on December 14, 2007 to "discuss structure changes on two loans that could benefit your cash flow and my legal lending limit."

136.   To that end, Ms. Leek and John K. Doull met at 2 p.m. on Friday, December 14, 2007.   John K. Doull told Ms. Leek that shortening the amortization on the Southpark Commons (OSFP's office project) loan helped him comply with the Bank's legal lending limit.

137.   John K. Doull advised Ms. Leek that in exchange for OSFP's agreement to shorten the amortization on OSFP's Southpark Commons loan, the Bank would change

the payments to interest-only payments on the $8,625,000 loan which would result in a net reduction of approximately $5,000.00 in OSFP's monthly payments.

138.   At 6:33 a.m. on Saturday morning December 15, 2007, John K. Doull sent Ms. Leek an email with the exact numbers:  the change to the $8,625,000 loan would decrease the payment amount from $60,307.25 to $53,397.30 and the change on the Southpark Commons loan would increase the payment from $12,996.36 to $15,014.38. Thus, the net impact to OSFP's monthly cash flow was a positive $4,891.93.

139.   John K. Doull wrote: "Here are the numbers.  Please let me know how to proceed, when you are ready."

140.   On Monday, December 17, 2007, at 1:23 p.m., Ms. Leek sent an email back to John K. Doull advising John K. Doull:  "John, This looks fine.  Please proceed with the appropriate loan modifications."

141.   In reliance on the Bank's December 2007 agreement to modify the Note to interest-only payments, OSFP executed modification documents for the Southpark Commons loan on or about February 19, 2008.

142.   The Bank, however, after receiving the modification to the Southpark Commons loan as requested, refused to comply with the modifications of the Note as had been previously agreed by the Bank pursuant to the email transactions.

143.   As a result of the Bank's refusal to comply with the email agreement modifying the Note as agreed to on December 15, 2007, OSFP's monthly cash flow decreased by over $2,000.00 beginning on or about February 8, 2008.

144.  OSFP would not have agreed to the modification of the Southpark Commons loan if it knew that the Bank would not comply with the agreed to modifications of the Note.

145.  When confronted with the Bank's refusal to comply with the modifications of the Note as had been previously agreed by the Bank, John K. Doull indicated that he forgot that there were no personal guaranties and the participating banks would not agree to the modification.

146.  In May, 2008, the Bank, for the first time, advised OSFP that, notwithstanding the representations made in 2006 to induce OSFP to enter into the loan terms presented at that time, the Bank had, in fact, participated the loan out to two other banks.

147.  OSFP had no idea that participating banks were involved in any decisions, or that John K. Doull had lied to them in November, 2006 when he signed participation agreements with these lenders the day after he told Ms. Leek he needed her help to avoid the need to participate any part of the loan.

148.  In May, 2008, Cornerstone advised OSFP that the participating banks had rejected the modification and encouraged OSFP to contact another bank to refinance the entire loan.

***OSFP Paid Down the Note and Fully Expected to be Able to Advance it Back up When Needed.***

149.  OSFP paid down the principal balance on the Note by $308,661.22.

150.   On or about June 15, 2010, OSFP, consistent with the Note, requested that the Bank advance the loan for the June 15, 2010 payment, but the Bank refused to do so.

151.   Mr. Huckleberry and Ms. Leek made this request in person to John K. Doull and John V. Doull on June 15, 2010 at a meeting at the Bank.

152.   On June 15, 2010, Ms. Leek and Mr. Huckleberry came to the Bank and "wanted to, first of all, readvance on the land loan for the payment that was due that day, the principal pay downs that they had made, that was the first request."

153.   After requesting that the loan be advanced to pay interest on June 15, Ms. Leek and Mr. Huckleberry "suggested to [the Bank] in terms of a longer term plan to deal with that issue that they wanted to readvance the principal that had been paid down on the office building and the principal that had been paid down on the land loan over the course of a longer period of time to give them time to sell the property."

154.   Thus, the plan submitted to the Bank was "to pay the interest [on the land loan] with the $600,000 that they had already paid down, and they thought that was going to get them through the summer of 2011 and give them an opportunity to market the property."

155.   Thereafter, on June 24, 2010, John V. Doull emailed Ms. Leek and stated that "[t]imes have drastically changed from when the loan originated.  At this time the Banks [sic] initial thoughts are not to re-advance . . ."

156.   The Bank knew that the written agreements between the Bank and OSFP deleted all "insecurity" provisions.

157.   The written agreement John K. Doull signed and initialed as President of

the Bank explicitly removed any right the Bank may claim that it had to not "advance" funds under the Note because the Bank thought "circumstances had changed."

158.  The Bank asserted these changed circumstances as its only excuse for not advancing the funds.

159.  OSFP relied in good faith on the representations and promises made by John K. Doull.

160.  After refusing to fund the Note as agreed, the Bank notified OSFP Parties that the Loan had been accelerated and the full amount was then due and owing.

161.  At the June 15, 2010 meeting with John K. Doull and John V. Doull, Mr. Huckleberry very emphatically stated "I want you to do what you told us you were going to do and readvance that principal that we paid down because we need it now", and although John K. Doull does not recall whether Mr. Huckleberry "used the word 'readvance' or not" he recalls that this was "the essence … of what … they asked for."

162.  John K. Doull acknowledges that Ms. Leek and Mr. Huckleberry claimed that Doull had made "representations to Ms. Leek that it was their understanding that when they agreed to make this additional $7,000 per month principal payment, that if they needed to readvance that principal at a later date, they would have the right to do so."

163.  John K. Doull clearly understood that "when they came to your office on June 15th, 2010" Mr. Huckleberry and Ms. Leek "want[ed] to make the interest payment that [was] due [that day] by readvancing the money that [had been] paid down on the principal … because that's what [the] agreement was."

29

164.   At a subsequent meeting on July 22, 2010, Ms. Leek inquired of John K. Doull regarding the agreement to advance the Note back up, and John K. Doull responded that the agreement to advance the Note back up was "more like an option." *The Bank rejected OSFP's plan without ever offering an alternative.*

165.   Even though OSFP had submitted detailed plans to pay back the Bank, no one from the Bank "ever [went] to Olathe/Santa Fe and sa[id] listen, if you give us the additional collateral, we'll give you the $2 million that you need to get through the next two years to get this property marketed."

166.   The communications by the Bank "with Olathe/Santa Fe about a workout, … never got any farther than [the Bank] asking for more collateral and [OSFP] saying, no, we want you to advance like you agreed under the existing collateral package." *Property Taxes as a Default are Ruse.*

167.   The Bank belatedly claimed that it declared a default because OSFP had not paid property taxes, but the Bank's demand letter and acceleration of the Loan, however, make no mention of a default for failure to pay property taxes.

*The Bank Was on a Mission to Shrink the Outstanding Real Estate Loans in 2010 and believed if they applied enough pressure, OSFP would use its existing collateral to move the largest real estate loan Cornerstone has out of the Bank.*

168.   The management of the Bank was under pressure to move real estate loans out of the Bank, and the Bank's strategy was to foreclose on OSFP's property and pursue collection against the partners or OSFP's unencumbered property.

169.   A "multiple advance loan" involved making "more than one advance of principal" and a "single advance loan" only involved one single advance of principal.

170.   Moreover, a "closed end loan" involving a "single advance" meant the entire principal was advanced one time at closing

171.   According to the Bank, a "closed end line of credit" means you can borrow "the amount of the note one time."

172.   On an "open end line of credit" a borrower may "borrow up to the maximum amount of principal more than one time."

173.   According to Brad Harvey, his "understanding after 30 years in the banking business" is that "if a loan document said this is a closed end line of credit and went on to say, 'You and I agree that I may borrow up to the maximum only one time', you would reach the conclusion that that was a closed end line of credit."

174.   On an "open end line of credit" when a borrower pays "down  part of the principal balance on a loan" the borrower then has the right to "readvance and borrow that principal more than one time."

175.   According to Mr. Harvey, if the loan documents the Bank asked its customers to sign do not "specifically say it's an open end line of credit or a closed end line of credit, but says that it's a multiple advance loan" there is nothing to put the customer on notice regarding whether the loan is a "closed end line of credit" or an "open end line of credit" – the Bank simply "assumes" that it is "closed end" line of credit.

176.   The Note with OSFP did not provide one way or the other that it was a "closed end line of credit" or an "open end line of credit".

177.   Paragraph 3 of the Note did not provide any "specific language that says [the loan] can only be advanced up once."

178.   Nowhere in the Note with OSFP did the Bank make "it clear that [OSFP] had no right to readvance the money once they paid down the principal on the loan."

179.   According to Mr. Harvey, based upon his 30 years of banking experience, if the Bank officer was "discussing and told the customer that they were going to have the right to readvance principal" after the customer "had paid down the loan" that the Bank would not use the form of the Note used with OSFP, but instead would use a form which made it more clear that the customer had the right to readvance the loan "more than one time".

180.   According to Mr. Harvey, the form of the note to be used when the Bank officer was "discussing and told the customer that they were going to have the right to readvance principal" after the customer "had paid down the loan" should explicitly say that the customer "may borrow up to the maximum amount of principal more than one time".

181.   Mr. Harvey has known John K. Doull for over 20 years and knows that John K. Doull had 25 years of banking experience in 2006 when these transactions were discussed with OSFP, and Mr. Harvey "had no doubt" that Mr. Doull understood "what the loan documents meant that he was actually preparing and approving on behalf of the bank."

182.   The Bank monitors the property taxes on all loans that are secured by real estate from the day the loan is made.

183.   There are cases where the Bank will not declare a default when the taxes have not been paid on property the Bank has placed a mortgage.

184.   The Bank periodically has told its customers that the Bank "would rather [the customer] use [the customer's] cash flow to pay the Bank interest than to pay the property taxes."

185.   Mr. Harvey understood that the loan documents "with [OSFP] had a cure period for any default."

186.   The Bank's internal memos describing the Bank's meeting and communications with OSFP parties in the summer of 2010 reflect that the Bank advised OSFP that it could not "advance" funds on the Note as requested by OSFP "due to regulatory guidelines".

187.   According to Mr. Harvey, the "regulatory guideline issue would have been basically a prohibition" – "you can't advance money out for interest payments on projects."

188.   According to Mr. Harvey, the Bank "assumed" that the Bank would be criticized if it advanced money to OSFP in the summery of 2010 to pay interest expense

189.   Even though the Bank "assumed" this would be the regulatory stance, there was no specific directive or any documentation that the Bank was aware of that said the Bank "was prohibited from advancing interest on real estate loan[s] as of June 15, 2010."

190.  Mr. Harvey was well aware of the fact that Federal Regulators including the FDIC announced guidelines in 2008 that prohibited banks from having a loan portfolio that "had more than 100 percent of its capital in real estate loans" and that the Bank was "a heavy real estate loan bank."

191. John Dugan, the Comptroller of the Currency commented on the "challenges we face – both community banks and the OCC – from the intersection of two inescapable facts:  significant community banking concentrations in commercial real estate loans, and the declining quality of a number of these loans, especially those related to residential construction and development."

192.  Mr. Dugan added:   "It's a first principle of sound banking and bank examinations that, the higher a bank's concentration in a particular category of loans, the greater the risk that losses from that asset class will affect the financial soundness of the bank."

193.  "The combination of these conditions is putting considerable stress on one particular category of commercial real estate lending:  residential construction and development …."

194. "Over the past four years our examiners have assessed your risk management practices in an effort to ensure they are appropriate for the level of risk you have assumed.  These efforts continued all over the country in 2007 and have extended into 2008."

195.  Mr. Dugan further commented in his remarks that "[t]here will be more criticized assets; increases to loan loss reserves; and more problem banks.  And yes, there will be an increase in bank failures."

196.  Mr. Dugan cautioned in his remarks that "it will almost certainly require you to downgrade more of your assets, increase loan loss provisions, and reassess the adequacy of bank capital."

197.  Mr. Dugan stressed that the common goal between the OCC and the banks was to "make sure that banks remain safe and sound so you can continue to meet the needs of your customers."

198.  "Over a third of the nation's community banks have commercial real estate concentrations exceeding 300 percent of their capital, and almost 30 percent have construction and development loans exceeding 100 percent of capital."

199.  In 2008 and 2009, Cornerstone Bank had real estate loans totaling over $156,000,000.00 which was 700 percent of the Bank's capital at the end of 2009 which was only $21,886,000.

200.  The Bank had grown rapidly in just six (6) years from assets of only $22,593,000 on December 31, 2001 to assets of $292,699,000 on December 31, 2007 (increasing by twelve times in just six years) mostly in real estate loans.

201.  The Bank's "heavy real estate" concentration began to take a toll on the Bank's profits in 2008 and 2009 with the Bank's capital shrinking from $27,314,000 as of December 31, 2008 to $15,218,000 by September 30, 2010.

202.   The Bank also began to show massive financial losses including a loss at the end of 2009 of $5,605,000.00 and losses from January 1, 2010 through September 30, 2010 of $7,143,000.00.

203.   Moreover, as of September 30, 2010 the Bank was reporting that 14.18% of its loans were "noncurrent".

204.   According to Mr. Harvey, the Bank has attempted to "reduce the Bank's concentration of real estate loans".

205.   In addition to reducing real estate concentrations, the Bank has attempted to raise capital and shrink the assets of the Bank in an effort to "help with these ratios with regulators in terms of concentration in real estate."

206.   Even though these were considerations by the Bank in the summer of 2010, Mr. Harvey believed that if OSFP would have provided "additional collateral" the Bank likely would have found a way to "advance money up on other property".

207.   One thing that clearly concerned the Bank in view of its already difficult financial picture in the summer of 2010 was that if the Bank "advance[s] money" on OSFP loan without any additional collateral "to pay interest expenses" this very well could cause the Loan to be reclassified.

208.   Moreover, if the classification or rating of the Loan changed, it could cause the Bank to be required to set aside more capital for loan loss reserves by regulators which would further impair the Bank's ratio of capital to real estate loans as reviewed by regulators.

209.  As a result of the Bank's own financial position, the Bank pressed OSFP to provide more collateral and ultimately developed a strategy that if the collateral was not voluntarily offered by OSFP, then the Bank would attempt to foreclose on the existing property subject to the mortgage and establish a lien on the unencumbered property of OSFP that OSFP refused to voluntarily offer to the Bank.

210.  Even with the participation agreements entered into by the Bank without OSFP's knowledge and contrary to John K. Doull's statements to Ms. Leek that the Bank would not participate the loan, the Bank was not incompliance with its legal lending limits.

211.  Prior to John K. Doull representing to Ms. Leek that the loan at issue needed to be changed to principal and interest amortized over 30 years, the Bank had received information from the Office of the State Bank Commissioner that in order for the loan to be considered amortizing for the purposes of calculating the legal lending limits the loan needed to be amortized over the term of the loan (not 30 years as proposed by John K. Doull):  "The only way we would allow the balloon payment note to be considered "amortizing" is if 1/5 of the principal amount were paid over the 5 year time frame.  We define 'amortize' to mean extinguishment of the principal amount of the obligation."

212.  The Bank's noncompliance would have been an issue to OSFP because, if OSFP did not sell any property, one of OSFP's options would be to go back to the bank and borrow more money (with more valuable collateral).

37

213.   That option seemed very plausible at the time because John K. Doull told OSFP prior to the closing of the Loan transaction at issue that the Bank could handle the entire loan at its current size if OSFP amortized the Loan, that the Bank was growing, and that the Bank wanted even more of the Huckleberry Parties' business.

214.   As of January 29, 2007, the Bank still was not in compliance and trying to find more participants.  "Dear Sirs:  I would like to over line $800M of this $8.65MM loan.  I have most of it, but its size requires that I sell a little bit more. The client is  a 17 year customer of mine, no personal guaranty, but unrealized gain on his balance sheet of about $4MM....I will agree to buy back approximately $125,000 each month as my loan limit grows."

215.   Further, in a memo dated April 18, 2007 to the Bank's loan committee, John K. Doull informed the loan committee he is still trying to sell a participation in the loan and admits that the amortization is too long to qualify for a 35% limit.  "I continue to try to sell a participation of $489M…They would like to take $1MM of the credit, but we have indicated we would like to buy back at least $125M a month because it will fit within our loan limit within four months.  Since the amortization is on 25 years not 20 years, it is insufficient to qualify for a 35% limit.  If the amortization could be increased, it will fall under the 35% limit."

216.   Moreover, in a memo to the loan committee, dated 1/9/08[1], John V. Doull writes:  "The loans were originated outside of the Bank's legal lending limit, with the impression that the Bank would grow to support the size of the loans.  With the current structure of the loans they are still not within the Bank's legal lending limit."

217.   OSFP did not sign and return any of the Debt Modification Agreements regarding the Note because John K. Doull of the Bank told Ms. Leek that OSFP could not do so.

218.   Ms. Leek did not tell John V. Doull that Mr. Huckleberry wanted to leave Loan No. 906003 as a principal and interest payment.

219.   Mr. Huckleberry never instructed Ms. Leek to "contact Cornerstone Bank and tell the bank that you were not interested in the debt modification on Loan No. 906003 and you wanted to leave it as principal and interest."

220.   OSFP was prepared to make payments under the terms of the agreement with the Bank.

221.   OSFP continued to make principal and interest payments after May 2008 because OSFP understood that the Bank would re-advance monies under the Loan based on the language of the agreement and the representations made by John K. Doull to Ms. Leek prior to the execution of the loan documents for the Loan.

---

[1] The memo is inadvertently dated January 9, 2007.  However, the context of the memorandum indicates that the correct date is January 9, 2008 in that the memorandum is referring to the debt modifications proposed by the Bank in December 2007.

222.   The pay down of the principal allowed the Note to be readvanced if necessary.

223.   Mr. Huckleberry and Ms. Leek on behalf of OSFP requested that the Bank perform under the agreements and re-advance the monies, but the Bank failed to do so.

224.   The Bank did not demand or give OSFP a right to cure with respect to the payment of taxes.

225.   Ms. Brehm in her July 15, 2010 email to John V. Doull and copied to John K. Doull and Brad Harvey indicated that Cornerstone should file suit so that "the world" knows how OSFP honors its debts knowing that this could trigger default provisions in loan documents with other lenders with whom OSFP was doing business.

***Bank Policies of Good Faith and Privacy***

226.   The loan officers for the Bank knew that the Bank's Ethics Code "allowed them to openly discuss with customers about how the bank was going to conduct itself" which included that the Bank "would act in good faith".

227.   This included that the Bank "[w]asn't going to lie to the customer", would "treat the customer with fairness and respect" and "[w]ould do what was necessary to protect the customer's interest".

228.   The Bank represented to the OSFP Parties from the outset of the relationship that it would conduct its business consistent with standards of honesty, integrity, fidelity and fairness.

***Failure to Act in Good Faith***

229.   It is clear that "good faith and fair dealing" requires "co-operation on the

part of both parties" and that "by implication" the parties must do "everything to accomplish the results intended" and "not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement".

230.  The parties to an agreement shall not "intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."

231.  The Bank's actions show bad faith in its dealings with Plaintiffs, such as engaging in "subterfuges" and "interference with or failure to cooperate in the other party's performance" including failing to act with:

      a.     "Honesty in fact"

      b.     "Faithfulness to an agreed common purpose and consistency with the justified expectations of the other party"

      c.     "Violating community standards of decency, fairness, or reasonableness"

      d.     "Subterfuges and evasions"

      e.     "An implied promise against arbitrary or unreasonable conduct"

      f.     "Willful rendering of imperfect performance"

      g.     "Failure to cooperate in the other party's performance"

      h.     "Duty to do everything necessary to carry out the agreement and accomplish the results intended"

      i.     "Declaring a default at the whim and caprice of one party"

      j.     "Each party will not intentionally and purposely do anything to prevent the other party from performing"

      k.      "The observance of reasonable commercial standards of fair dealing"

      l.      Each party shall not do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"

### COUNT I
(Fraud)

232.   Plaintiffs incorporate the allegations continued in paragraphs 1 through 231 as if fully set forth herein.

233.   John K. Doull knew that certain statements were false, and intended to deceive the OSFP and its partners in order to induce OSFP and its partners to enter into certain agreements.  Further, John K. Doull in order to induce the OSFP Parties to take actions as more fully set out herein either falsely represented or failed to disclose material information including without limitation, those statements set forth above on November 14, 2006 to Ms. Leek that the Bank did not want to participate out the Loan, but needed the Loan to be an amortizing loan so that the Bank could finance the entire transaction; that making the Loan amortizing would put the Bank within its lending limit and that the Bank would not have to participate out any part of the Loan; and that if OSFP agreed to make the Loan amortizing that the Bank under its agreements with OSFP would advance the Loan back up after OSFP paid the principal down if OSFP agreed to make principal and interest payments instead of interest only.

234.   John V. Doull in order to induce OSFP and its partners to take actions as more fully set out herein either falsely represented or failed to disclose material

information including without limitation that the appraisal relied on by the Bank to claim that it needed more collateral was inaccurate; that the Bank was under pressure concerning the Bank's excessive concentration in real estate loans; and that the Bank after obtaining the modification requested by the Bank on the Southpark Commons loan would refuse to modify the Note.

235.   The OSFP Parties approved the transaction and signed documents to accommodate John K. Doull and John V. Doull, based on John K. Doull's and John V. Doull's material representations and failure to disclose material information.

236.   All of these matters were material to the OSFP Parties.

237.   John K. Doull knowingly made these misrepresentations.

238.   John V. Doull knowingly made these misrepresentations.

239.   John K. Doull intended to deceive the OSFP Parties.

240.   John V. Doull intended to deceive the OSFP Parties.

241.   The OSFP Parties acted in reliance on John K. Doull's misrepresentations, and the OSFP Parties were justified in such reliance.

242.   The OSFP Parties acted in reliance on John V. Doull's misrepresentations, and the OSFP Parties were justified in such reliance.

243.   As a direct and proximate result of John K. Doull's and John V. Doull's misrepresentations, the OSFP Parties have been damaged.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of said parties and against John K. Doull and John V. Doull, and each of them, in the amount of their damages as established by the evidence, which are in excess of

$75,000.00; for pre-judgment interest and post-judgment interest as provided by law; for their costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

**COUNT II**
(Fraudulent Nondisclosure)

244.   Plaintiffs incorporate the allegations contained in paragraphs 1 through 243 as if fully set forth herein.

245.   Throughout the development of the various projects, a relationship existed of trust and confidence between the OSFP Parties and John K. Doull on the subject of OSFP's relationships and completion of the various projects which gave rise to a duty of disclosure by John K. Doull.

246.   While such relationship existed, John K. Doull failed to disclose material information including that John K. Doull had no intent to allow OSFP to readvance monies after OSFP had made a principal pay down; that the Bank had signed participation agreements with two participant banks and was seeking a third; that the Bank was not in compliance with its legal lending limits even after the Loan was modified at the Bank's request to an amortizing loan; that the appraisal relied on by the Bank to claim that it needed more collateral was inaccurate; that the Bank was under pressure concerning the Bank's excessive concentration in real estate loans; that the Bank after obtaining the modification requested by the Bank on the Southpark Commons loan would refuse to modify the Note; and that participant approval was necessary to modify the Note to interest only.

247.   All of these undisclosed matters were material to the OSFP Parties.

248.   John K. Doull knowingly failed to make the disclosures.

249.   John K. Doull intended to deceive the OSFP Parties by withholding the information.

250.   The OSFP Parties acted in reliance on John K. Doull's failure to disclose, and the OSFP Parties were justified in such reliance.

251.   As a direct and proximate result of John K. Doull's failure to disclose material information, the OSFP Parties have been damaged.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of said parties and against John K. Doull in the amount of their damages as established by the evidence, which are in excess of $75,000.00; for pre-judgment interest and post-judgment interest as provided by law; for their costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT III
(Negligent Misrepresentation against John K. Doull)

252.   Plaintiffs incorporate the allegations of paragraphs 1 through 251 as if fully set forth herein.

253.   John K. Doull negligently supplied or failed to disclose the following information to the OSFP Parties including, without limitation, those statements set forth above on November 14, 2006 to Ms. Leek that the Bank did not want to participate out the Loan, but needed the Loan to be an amortizing loan so that the Bank could finance the entire transaction; that making the loan amortizing would put the Bank within its

lending limit and that the Bank would not have to participate out any part of the Loan; that if OSFP agreed to make the Loan amortizing that the Bank under its agreements with OSFP would advance the Loan back up after OSFP paid the principal down if OSFP agreed to make principal and interest payments instead of interest only; that John K. Doull had no intent to allow OSFP to readvance monies after OSFP had made a principal pay down; that the Bank had signed participation agreements with two participant banks and was seeking a third; that the Bank was not in compliance with its legal lending limits even after the Loan was modified at the Bank's request to an amortizing loan; that the appraisal relied on by the Bank to claim that it needed more collateral was inaccurate; that the Bank was under pressure concerning the Bank's excessive concentration in real estate loans; that the Bank after obtaining the modification requested by the Bank on the Southpark Commons loan would refuse to modify the Note; and that participant approval was necessary to modify the Note to interest only.

254.  John K. Doull had a financial interest in supplying and/or withholding the information.

255.  John K. Doull supplied the false information to influence the transactions for which the information was supplied.

256. John K. Doull provided the information concerning Cornerstone's financing of the transactions for which the information was supplied in the course of John K. Doull's business.

257.  Due to John K. Doull's failure to exercise reasonable care, the information supplied by John K. Doull to induce the OSFP Parties to enter into transactions with Cornerstone was false.

258.  The negligently supplied information was a proximate cause of the OSFP Parties' damages.

259.  The OSFP Parties acted in reliance on the truth of the information supplied and was justified in relying on the information.

260.  As a result of the OSFP Parties' reliance on the information provided by John K. Doull, the OSFP Parties have been damaged.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against John K. Doull for such damages as are fair and reasonable in excess of $75,000, the exact amount to be proved at trial; for prejudgment and post-judgment interest as provided by law; for Plaintiffs' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT IV
(Breach of Fiduciary Duty Against John K. Doull)

261.  Plaintiffs restate and incorporate each and every allegation set forth in paragraphs 1 through 260 herein.

262.  John K. Doull has been and remains in a position of trust and confidence to act in the best interest of the OSFP Parties.

263.  John K. Doull owed a fiduciary duty to Plaintiffs to keep Plaintiffs informed of any changes and/or developments with respect to the loan transaction with OSFP.

264.  John K. Doull breached its duty to Plaintiffs by authorizing the foreclosure of properties owned by OSFP in contravention of the agreements reached with the Bank.

265.  Plaintiffs suffered damages as a result of John K. Doull's breach, the amount of which is not presently determined.

WHEREFORE, Plaintiffs pray to this Court for a judgment against John K. Doull in an amount in excess of $75,000.00, the exact amount to be proved at trial; for prejudgment interest and post-judgment interest as provided by law; for Plaintiffs' costs and expenses incurred herein including attorneys' fees; and for any and all other relief that this Court deems just and proper.

## **COUNT V**
(Publication of Injurious Falsehoods against John K. Doull)

266.  Plaintiffs incorporate the allegations of paragraphs 1 through 265 as if fully set forth herein.

267.  John K. Doull made statements regarding OSFP to someone other than OSFP which were false and in violation of Cornerstone's policies and procedures and violations of law.

268.  John K. Doull published injurious falsehoods concerning OSFP including the false statements concerning alleged defaults under agreements with Cornerstone and statements to third parties that Cornerstone was going to foreclose.

269.  Said statements were published to the public and third parties, and the publications were made under such circumstances that third parties would repeat the injurious falsehoods, that John K. Doull knew that the communications would be injurious to the OSFP Parties, that John K. Doull understood that the communications applied specifically to OSFP's business and properties, that there would be a pecuniary loss likely to result to the OSFP Parties as a result of the publication, that John K. Doull had knowledge of the falsity of the statements or were recklessly disregarding the truth or the falsity of the statements before he made them, that John K. Doull was motivated by ill-will, that John K. Doull intended to affect the OSFP Parties' interest in an unprivileged manner by violating representations of privacy that John K. Doull had made to the OSFP Parties, all as more fully set forth herein.

270.  John K. Doull made the statements with malice.

271.  The statements by John K. Doull tended to injure the reputation of the OSFP Parties and/or injure the OSFP Parties in their efforts to maintain their business.

272.  The statements caused damages to the OSFP Parties.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against John K. Doull for such damages as are fair and reasonable in excess of $75,000, the exact amount to be proved at trial; for prejudgment and post-

judgment interest as provided by law; for Plaintiffs' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT VI

(Negligent and/or reckless failure to supervise against the Outside Directors)

273.   Plaintiffs incorporate the allegations of paragraphs 1 through 272 as if fully set forth herein.

274.   The Outside Directors had a duty to supervise the Bank's employees and officers in the course of their activities on behalf of the Bank in connection with the Bank's communications and transactions with OSFP.

275.  The Bank and the Outside Directors failed to supervise the Bank's employees in this regard by, among other things, failing to review John K. Doull's, John V. Doull's, and Brad Harvey's actions and other Bank employees in declaring a default and in refusing to honor agreements as agreed to by the Bank and failure to supervise John K. Doull, John V. Doull, and Brad Harvey in connection with the administration of the Bank's transactions with OSFP.

276.  The Bank and the Outside Directors' failure to supervise was negligent and/or reckless and with malice.

277.   As a direct and proximate result of Bank and the Outside Directors failure to supervise, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Kent Whittaker, Michael N. McDaniel, and Thomas DeBacco, and each of them, for such damages as are fair and reasonable in excess of

$75,000, the exact amount to be proved at trial; for prejudgment and post-judgment interest as provided by law; for Plaintiffs' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT VII
(Negligent and/or reckless failure to supervise against the John K. Doull, Brad Harvey and Nancy Taylor)

278.   Plaintiffs incorporate the allegations of paragraphs 1 through 277 as if fully set forth herein.

279.   The Bank and its officers John K. Doull, Brad Harvey, and Nancy Taylor had a duty to supervise its employees and other subordinate officers in the course of their activities on behalf of the Bank in connection with the Bank's communications and transactions with OSFP.

280.   The Bank and John K. Doull, Brad Harvey, and Nancy Taylor failed to supervise its employees in this regard by, among other things, failing to review employee's actions in connection with documentation of loans, in violation of the Bank's policies and procedures and failure to supervise actions and communications to OSFP and third parties.

281.   The failure to supervise was negligent and/or reckless with malice.

282.   As a direct and proximate result of the failure to supervise, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against John K. Doull, Brad Harvey, and Nancy Taylor, and each of them, for such damages as are fair and reasonable in excess of $75,000, the exact

amount to be proved at trial; for prejudgment and post-judgment interest as provided by law; for Plaintiffs' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT VIII
(Violations of Racketeer Influenced Corrupt Organizations Act)

283.    Plaintiffs incorporate the allegations of paragraphs 1 through 282 as if fully set forth herein.

284.    The Bank has intentionally deceived OSFP in order to improve its financial position.

285.    The Bank's and other defendants' fraudulent misrepresentations to OSFP have been advanced or furthered by use of the United States mail for the purpose of executing the scheme or artifice.

286.    The Bank's and other defendants' fraudulent misrepresentations to OSFP have been advanced or furthered by use of wires for the purpose of executing the scheme or artifice.

287.    The Bank and other defendants have made misrepresentations and engaged in bad faith conduct to defraud other persons in a similar position as OSFP using similar methods of commission and in furtherance of similar purposes namely to force the Bank's customers to move real estate loans out of the Bank and/or convert the Bank's customer's property to cash to shore up the Bank's liquidity.

288.   Upon information and belief, such other persons include, but are not limited to, Sheryl Clanton, McCorkendale Construction, McClan, L.L.C., and Mark Neighbors.

289.   Upon information and belief, the misrepresentations and/or conduct to these other similarly situated persons and/or entities included, without limitation, affirming that the Bank could perform its agreements when it had no ability or intent to do so; failing to advise of the extent to which Bank was experiencing write-offs due to bad loans which impacted Bank's ability to perform its agreements; and making false statements to improve the Bank's position.

290.   The Bank has operated or managed an enterprise whose goal is to advance the Bank's schemes to OSFP and others such as Sheryl Clanton, McCorkendale Construction, McClan, L.L.C., and Mark Neighbors and that said enterprise includes owners and officers of the Bank.

291.   The Bank's and other defendants' enterprise has engaged in or affects interstate commerce.

292.   The Bank and other defendants have conducted and participated directly or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).

293.   The Bank's and other defendants' conduct threatens to be repeated or to extend into the future.

294.   The Bank's and other defendants' acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity.

295.  Plaintiffs were injured in their business or property by reason of this violation of 18 U.S.C.A. § 1962 in that as a direct and proximate result of the complained of acts, Plaintiffs have been damaged.

296.  By reason of the violation of 18 U.S.C.A. § 1962, Plaintiffs are entitled to threefold the damages sustained, plus interest and recovery of a reasonable attorneys' fee.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants, and each of them, for threefold the damages sustained as established by the evidence; for pre-judgment interest and post-judgment interest as provided by law; for their costs and expenses incurred herein, including a reasonable attorneys' fee; and for any and all other relief that this Court deems just and proper.

## COUNT IX
### (Civil Conspiracy)

297.  Plaintiffs incorporate the allegations of paragraphs 1 through 296 as though fully stated herein.

298.  The Bank along with the John K. Doull, Nancy Taylor, Brad Harvey, the Outside Directors, and others ("Conspiring Parties") conspired with an object to be accomplished to among other things commit fraud, negligent misrepresentation, and breaching fiduciary duties to the OSFP Parties.

299.   The Conspiring Parties had a meeting of the minds on the course of action to among other things commit fraud, negligent misrepresentation, and breaching fiduciary duties to the OSFP Parties for the purpose of increasing liquidity for the Bank.

300.   As a result of the actions of the Conspiring Parties set out herein, the OSFP Parties have been damaged.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against the Conspiring Parties, and each of them, for damages in excess of $75,000 as established by the evidence, the exact amount to be proven at trial; for pre-judgment interest and post-judgment interest as provided by law; for their costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

## DESIGNATION OF PLACE FOR TRIAL

Plaintiffs hereby designate Kansas City, Kansas as the place of trial for this matter.

Respectfully submitted,

DUGGAN, SHADWICK, DOERR &
KURLBAUM
A Professional Corporation


By /s/ John M. Duggan
      John M. Duggan, KS #14053
      Deron A. Anliker, KS #16877
      Thomas J. Hamilton, KS #24139
      11040 Oakmont
      Overland Park, Kansas 66210
      jduggan@kc-dsdlaw.com
      danliker@kc-dsdlaw.com
      (913) 498-3536
      Fax (913) 498-3538
      Attorneys for Plaintiffs